[No. C042915. Third Dist. Mar. 12, 2004.]

PROTECT THE HISTORIC AMADOR WATERWAYS, Plaintiff and
Appellant, v.
AMADOR WATER AGENCY, Defendant and Respondent.

COUNSEL

Law Office of J. William Yeates, J. William Yeates, Mary U. Akens and Keith G. Wagner for Plaintiff and Appellant.

Bartkiewicz, Kronick & Shanahan, Alan B. Lilly and Stephen A. Kronick for Defendant and Respondent.

OPINION

ROBIE, J.—In this mandamus case, plaintiff Protect the Historic Amador Waterways challenged the environmental impact report (EIR) defendant Amador Water Agency (Agency) certified for a project that would replace the 130-year-old Amador Canal with a pipeline. The Agency acknowledges that "leakage from the Amador Canal contributes to the surface flow of water in local streams" and that putting the water from the canal into a pipe will reduce the summer flows in those streams, including a significant reduction in the south fork of Jackson Creek. Nonetheless, the Agency concluded in its EIR that this reduction in stream flow would not constitute a significant effect on the environment within the meaning of the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.) The superior court denied plaintiff's petition, finding the Agency had complied with CEQA and its conclusion was supported by substantial evidence.

---

[1] All further statutory references are to the Public Resources Code. We will refer to the CEQA statutes in the format CEQA section ____.

On appeal, plaintiff contends the Agency "abused its discretion when it concluded that modifying the hydrology of local creeks from perennial to intermittent surface flows (i.e., drying local streams during the late summer and early fall) due to the dewatering of Amador Canal was not a significant adverse physical change to the existing environmental conditions . . . ." According to plaintiff, the Agency "inappropriately used irrelevant thresholds of significance to avoid a meaningful, fair, and reasonable evaluation of the substantial evidence demonstrating significant adverse environmental changes in local stream hydrology."

■ We conclude the Agency abused its discretion because the EIR does not contain a required statement indicating the reasons why the Agency determined that the reduction in the surface flow of local streams would not be significant. Accordingly, we will reverse the superior court's judgment denying plaintiff's petition for a writ of mandate and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Originally constructed in 1870, the Amador Canal is a mostly unlined earthen ditch that transports water along the natural contours of the land approximately 23 miles from Lake Tabeaud to the Tanner Reservoir. The Agency, which owns the canal, wants to replace it with a pipeline that would run approximately eight miles in a more direct line between the lake and the reservoir. The objectives of the pipeline project include improving water quality, reducing water loss, and improving reliability of the water supply.

Having determined in an initial study that the project would have potentially significant impacts on several environmental factors, the Agency prepared a draft EIR for the project in September 2000.

The "Environmental Analysis" section of the draft EIR addressed the areas in which the project would have potentially significant environmental effects, including water resources and biological resources. The hydrology portion of the water resources section of the EIR discussed the results of a detailed hydrological analysis that was performed at the Agency's request to determine if leakage from the mostly unlined canal was contributing to the surface flow of local streams. Based on data from field studies in 1998, the Agency determined that the surface flow in parts of six local streams was increased in varying degrees by leakage from the canal, particularly in the summer and early fall (June through October). The Agency further determined that canal leakage was probably keeping the affected parts of some of these streams from becoming intermittent during drier years.

The Agency acknowledged in the EIR that the pipeline project would eliminate all leakage from the Amador Canal and that, as a result, "no

contribution to local surface discharges would occur" and "the flows in local streams now influenced by canal leakage and runoff capture would return to their historical hydrological conditions," i.e., the conditions that existed before the canal was built. The Agency predicted that the south fork of Jackson Creek and some of its tributaries would become intermittent "during August and September, and possibly October, in all but the wettest water-years" if the pipeline were constructed. The Agency similarly predicted intermittent flow in the middle fork of Jackson Creek, New York Ranch Gulch, Cooper's Gulch (already "intermittent or nearly so by the fall of most years"), and Oneida Creek ("barely perennial under current conditions") as a result of the pipeline.

Having identified the pipeline's likely impact on the surface flow of these streams, the EIR addressed the significance of that impact as follows: "The change in local hydrology associated with dewatering the Amador Canal and eliminating all leakage is not considered to be a significant hydrological impact *per se*. The hydrological changes may have effects on other resources dependent on hydrology, for example, water quality or wildlife, and these effects are discussed elsewhere in the [EIR]. Consequently, changes in hydrology are not significant. The impact of the Pipeline Alternative on hydrology is determined to be *less than significant*."

The EIR went on to address the potential effects of the pipeline on various biological resources, including wetland and riparian habitats in the project area. The EIR explained that the montane riparian habitat "occurs along seasonal and perennial streams in the project area," including the south fork of Jackson Creek and New York Ranch Gulch. The EIR discussed in several paragraphs the potential impact of the pipeline on various areas of wetland habitat created or supplemented by leakage from the canal. After noting the pipeline's impact on this wetland habitat would be "less than significant," the EIR addressed the impact of the pipeline on riparian habitat in a single sentence, as follows: "Similarly, the montane riparian vegetation would continue to thrive along local streamcourses, even if canal leakage is elimi-nated." The EIR then drew the following conclusion regarding the effect of the pipeline on "the wildlife habitats and the associated wildlife communities of the project area": "While the dewatering of the Amador Canal, attributed to the Pipeline Alternative, would change local hydrological conditions along the Amador Canal and in associated watersheds by eliminating leakage and restoring natural runoff, the interaction of these changes are not expected to significantly affect local wildlife communities or their distribution in the project area. It is determined that the effect of eliminating leakage on wildlife resources is *less than significant*."

After circulating the draft EIR for public review and comment, the Agency prepared a final EIR and in May 2001 adopted a resolution certifying the EIR and approving the project. The final EIR did not contain any relevant revisions to the sections of the draft EIR discussed above.[2]

In June 2001, plaintiff filed a petition for a writ of mandate in the superior court asserting, among other things, that the EIR failed to comply with the mandatory requirements of CEQA in various particulars. One of the particular shortcomings of the EIR plaintiff alleged was that it "[f]ailed to analyze and mitigate the significant adverse environmental impacts of the proposed project on the surrounding stream hydrology, especially various forks of Jackson Creek that are dependent upon leaks from the Amador Canal for surface flow and maintenance of riparian vegetation." Plaintiff went on to allege that "[c]hanging perennially flowing streams into intermittent streams is *per se* a significant change to the physical environment."

In September 2002, the superior court found the Agency had "substantially complied with the CEQA statutes and regulations and its decision to certify the EIR was supported by substantial evidence." Accordingly, the court denied plaintiff's petition. Plaintiff appeals from the resulting judgment.

## DISCUSSION

## I

### Standard of Review

In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record to determine whether the agency abused its discretion. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116–117 [104 Cal.Rptr.2d 326].) "Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170].) "When the informational requirements of CEQA are not complied with, an agency has failed to proceed in 'a manner required by law' and has therefore abused its discretion." (*Save Our Peninsula Committee v. Monterey County Bd. of*

---

[2] In its conclusion regarding the effect of the pipeline on the wildlife habitats and the associated wildlife communities of the project area, the final EIR did add a reference to a table contained in another section of the draft EIR showing the wildlife habitat types that would be "directly" impacted by the construction of the pipeline. This table of "direct" impacts did not address any impact that eliminating leakage from the canal would have on the riparian habitat along the local streams that would have reduced surface flow because of the pipeline.

*Supervisors, supra,* 87 Cal.App.4th at p. 118.) Furthermore, "when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66].)

"In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at p. 117.) However, "[w]hile we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute." (*Id.* at p. 118.)

II

*The EIR and Thresholds of Significance*

"An environmental impact report is an informational document," the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; . . . ." (CEQA, § 21061.) "The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (CEQA, § 21002.1, subd. (a).) "The EIR has been repeatedly recognized as the ' "heart of CEQA." ' " (*Communities for a Better Enviroment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 107 [126 Cal.Rptr.2d 441].)

A project will have a significant effect on the environment if it will cause "a substantial, or potentially substantial, adverse change in" "the physical conditions which exist within the area which will be affected by [the] project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (CEQA, §§ 21060.5 [defining "environment"], 21068 [defining "significant effect on the environment"].)

One of the first steps in the CEQA process is to determine whether the project *may* have a significant effect on the environment. "If there is substantial evidence, in light of the whole record before the lead agency, that a project may have a significant effect on the environment, an environmental impact report shall be prepared." (CEQA, § 21082.2, subd. (d).) Thus, "[d]etermining whether a project may have a significant effect plays a critical

role in the CEQA process." (Cal. Code Regs.,[3] tit. 14, § 15064, subd. (a).) "[S]ince the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].)

There is no "gold standard" for determining whether a given impact may be significant. "An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b).)

Under the Guidelines, however, "[e]ach public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a).) Such thresholds can be drawn from existing environmental standards, such as other statutes or regulations. " '[A] lead agency's use of existing environmental standards in determining the significance of a project's environmental impacts is an effective means of promoting consistency in significance determinations and integrating CEQA environmental review activities with other environmental program planning and regulation.' " (*Communities for a Better Environment v. California Resources Agency, supra,* 103 Cal.App.4th at p. 111.)

Former Guidelines section 15064, subdivision (h), specifically provided for the use of existing environmental standards as thresholds for determining the significance of environmental impacts, provided those standards met certain requirements. In relevant part, former Guidelines section 15064, subdivision (h), provided:

"(1)(A) Except as otherwise required by [s]ection 15065 [mandatory findings of significance], a change in the environment is not a significant effect if the change complies with a standard that meets the definition in subdivision (h)(3).

"[¶] . . . [¶]

---

[3] Hereafter, we will refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) in the format Guidelines section ____.

"(3) For the purposes of this subdivision a 'standard' means a standard of general application that is all of the following:

"(A) a quantitative, qualitative or performance requirement found in a statute, ordinance, resolution, rule, regulation, order, or other standard of general application;

"(B) adopted for the purpose of environmental protection;

"(C) adopted by a public agency through a public review process to implement, interpret, or make specific the law enforced or administered by the public agency;

"(D) one that governs the same environmental effect which the change in the environment is impacting; and,

"(E) one that governs within the jurisdiction where the project is located."

In *Communities for a Better Environment*, however, this court upheld the invalidation of former Guidelines section 15064, subdivision (h), because it was "inconsistent with controlling CEQA law governing the fair argument approach." (*Communities for a Better Environment v. California Resources Agency, supra*, 103 Cal.App.4th at p. 114.) We explained: "If a proposed project has an environmental effect that complies with a subdivision (h)(3) regulatory standard, the lead agency is *directed* under subdivision (h)(1)(A) . . . to determine that the effect is not significant, regardless of whether other substantial evidence would support a fair argument that the effect may be environmentally significant. This direction relieves the agency of a duty it would have under the fair argument approach to look at evidence beyond the regulatory standard, or in contravention of the standard, in deciding whether an EIR must be prepared." (*Id.* at pp. 112–113.) We concluded that an established regulatory standard could not be applied in a way that would foreclose the consideration of other substantial evidence showing that there might be a significant environmental effect from a project. (*Id.* at p. 114.) Accordingly, we agreed that former Guidelines section 15064, subdivision (h), was invalid.

 The invalidation of former Guidelines section 15064, subdivision (h), was not a repudiation of the use of thresholds of significance altogether. Public agencies are still encouraged to develop thresholds of significance for use in determining whether a project may have significant environmental effects. (See Guidelines, § 15064.7, subd. (a).) In the wake of our decision in *Communities for a Better Environment*, however, such thresholds cannot be used to determine automatically whether a given effect will or will

not be significant. Instead, thresholds of significance can be used only as a measure of whether a certain environmental effect "will *normally* be determined to be significant" or "*normally* will be determined to be less than significant" by the agency. (Guidelines, § 15064.7, subd. (a), italics added.) In each instance, notwithstanding compliance with a pertinent threshold of significance, the agency must still consider any fair argument that a certain environmental effect may be significant.

■ The use of thresholds of significance is not limited to the determination of whether an EIR must be prepared. Once a public agency has determined that a project *may* have one or more significant effects on the environment and therefore an EIR is required, the purpose of the EIR "is to identify the significant effects on the environment of [the] project." (CEQA, § 21002.1, subd. (a).) Thus, in preparing the EIR, the agency must determine whether any of the *possible* significant environmental impacts of the project will, in fact, be significant. In this determination, thresholds of significance can once again play a role. As noted above, however, the fact that a particular environmental effect meets a particular threshold cannot be used as an automatic determinant that the effect is or is not significant. To paraphrase our decision in *Communities for a Better Environment*, a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant. (See *Communities for a Better Environment v. California Resources Agency*, *supra*, 103 Cal.App.4th at p. 114.)

■ Thus, in preparing an EIR, the agency must consider and resolve every fair argument that can be made about the possible significant environmental effects of a project, irrespective of whether an established threshold of significance has been met with respect to any given effect. Once the agency has determined that a particular effect will not be significant, however, the EIR need not address that effect in detail. Instead, the EIR need only "contain a statement briefly indicating the reasons for determining that various effects on the environment of a project are not significant and consequently have not been discussed in detail in the environmental impact report." (CEQA, § 21100, subd. (c); see also Guidelines, § 15128.)

III

*The Agency's EIR Is Inadequate Because It Fails to Explain
the Reasons Why the Reduction in Stream Flow the Pipeline
Project Will Cause Does Not Constitute a Significant Effect
on the Environment*

With the foregoing principles in mind, we turn to the facts of this case. In its EIR, the Agency set forth various standards of significance it claimed to

have developed for application to the project. The Agency drew these standards largely verbatim from appendix G of the Guidelines, "Environmental Checklist Form" which, along with appendix H "Environmental Information Form," is designed to be used as an initial study to determine if a project may have a significant effect on the environment. (See Guidelines, § 15063, subds. (a) & (f).) The checklist consists of sample questions divided into categories of potential physical impacts a project may have, including impacts on "Biological Resources" and impacts on "Hydrology and Water Quality." For example, the first question in the "Hydrology and Water Quality" category is "Would the project . . . [v]iolate any water quality standards or waste discharge requirements?" The person filling out the form can check one of four boxes in response to each question: potentially significant impact, potentially significant unless mitigation incorporated, less than significant impact, and no impact. According to the instructions to the appendix G checklist, " 'Potentially Significant Impact' is appropriate if there is substantial evidence that an effect may be significant. If there are one or more 'Potentially Significant Impact' entries when the determination is made, an EIR is required."

The appendix G checklist contains 10 questions relating to hydrology and water quality. The Agency's standards of significance in the "Water Resources" section of its EIR were drawn from seven of those 10 questions.[4] Similarly, the appendix G checklist contains six questions relating to biological resources. The Agency's standards of significance in the "Biological Resources" section of its EIR are drawn largely from those six questions.

Plaintiff's challenge to the EIR in this case turns on the Agency's use of the appendix G sample questions as thresholds of significance. Specifically, plaintiff contends the Agency abused its discretion when it drew its thresholds of significance from the sample questions in appendix G because the environmental effects addressed in those questions were "too narrowly focused" and "irrelevant" to the project under consideration.[5] According to plaintiff, by adopting narrow and irrelevant thresholds of significance which did not address the particular physical change this project is going to have on the

---

[4] The "Standards of Significance" subsection of the "Water Resources" section of the EIR begins: "For the purpose of this EIR, an impact is considered significant if the proposed project would . . . ." Following this statement are the seven questions from the "Hydrology and Water Quality" portion of the appendix G checklist, e.g., "Violate any water quality standards or waste discharge requirements."

[5] Plaintiff also contends appendix G's sample questions cannot be used as thresholds of significance because they contain no significance criteria. We need not address this contention, however, because plaintiff's challenge to the EIR does not actually turn on the claimed absence of thresholds by which to measure the significance of a particular effect on the environment, but instead turns on the contention that the appendix G questions did not even address one of the environmental effects this project is going to have.

environment—the seasonal reduction of surface flow in local streams—the Agency was able to reach the false conclusion that "modifying the hydrology of local creeks from perennial to intermittent surface flows (i.e., drying local streams during the late summer and early fall) due to the dewatering of Amador Canal was not a significant adverse physical change to the existing environmental conditions." Stated another way, the Agency determined that the reduced stream flows "are insignificant since the thresholds developed from the standardized Appendix G checklist make it so."

It is apparent that the seasonal reduction of surface flow in local streams constitutes an effect on the environment within the meaning of CEQA, as the flow in those streams is part of "the physical conditions which exist within the area which will be affected by [the] proposed project" (CEQA, § 21060.5) and the reduction in stream flow is a change in those conditions. The question the Agency had to answer was whether the reduction of the surface flow in the streams constituted a *significant* environmental effect, i.e., "a substantial, or potentially substantial, adverse change in the environment." (CEQA, § 21068.)

Here, the Agency answered that question in the negative. Plaintiff contends it did so because it applied standards of significance that did not even address the reduction in stream flow as a potential environmental effect of the project. We cannot determine whether plaintiff is correct, however, because, contrary to CEQA requirements, the EIR fails to explain the reasons *why* the Agency found the reduction in stream flow would not be significant.

As noted above, an EIR must "contain a statement briefly indicating the reasons for determining that various effects on the environment of a project are not significant and consequently have not been discussed in detail in the environmental impact report." (CEQA, § 21100, subd. (c); see also Guidelines, § 15128.) Here, after explaining how construction of the pipeline would "affect existing local hydrology" by reducing surface flow in several streams, turning some of them into seasonally intermittent streams, the EIR simply states that "[t]he change in local hydrology associated with dewatering the Amador Canal and eliminating all leakage is not considered to be a significant hydrological impact *per se*." This assertion is not a statement of reasons, but a bare conclusion. As such, it does not satisfy CEQA requirements.

■ A statement of reasons is necessary to assure meaningful judicial review in the event, as here, the EIR is challenged in court. "Mere conclusions simply provide no vehicle for judicial review." (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 171 [217 Cal.Rptr. 893].) Here, for example, because there is no statement of reasons we cannot discern whether the Agency reached its

"less than significant" conclusion regarding the reduction in surface flow of local streams based on substantial evidence in the administrative record or because, as plaintiff asserts, it rotely applied standards of significance that did not address reduction in stream flow as a potential environmental effect of the project. Thus, the absence of the required statement of reasons prevents us from determining whether the Agency abused its discretion in the manner plaintiff claims. That absence itself, however, demonstrates an abuse of discretion by the Agency, because in omitting the required statement of reasons, the Agency failed to proceed in the manner required by law.

For this reason, we must reverse the superior court's denial of plaintiff's petition for a writ of mandate and remand the case for issuance of a writ directing the Agency to set aside its certification of the final EIR and to take the action necessary to bring the water resources section of the EIR into compliance with CEQA. (See CEQA, § 21168.9.)

██ This conclusion does not mean the Agency is required to start the EIR process anew. Rather, the Agency need only correct the deficiency in the EIR that we have identified before considering recertification of the EIR. The form of that correction is a matter for the Agency to determine in the first instance. (See CEQA, § 21168.9, subd. (c) ["Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way"].) Likewise, whether the correction requires recirculation of the EIR, in whole or in part, is for the Agency to decide in the first instance in light of the legal standards governing recirculation of an EIR prior to certification. (See CEQA, § 21092.1; Guidelines, § 15088.5; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1129–1130 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

IV

*The EIR Adequately States the Reasons Why the Pipeline*
*Project Will Have a Less Than Significant Impact on the*
*Riparian Habitat of Local Streams*

In addition to asserting the Agency abused its discretion in applying overly narrow and irrelevant standards of significance, plaintiff also suggests the Agency abused its discretion because the EIR contains "no analysis of how the reductions [in stream flow] will impact riparian habitat." Plaintiff complains that "what the public was given was a one-sentence conclusion that 'montane riparian vegetation would continue to thrive along local streamcourses if canal leakage is eliminated.' "

As we have explained already, when an agency determines a particular environmental effect of a project is not significant, the EIR does not have to

contain a detailed analysis in support of that determination. Rather, all the EIR must contain is a "statement briefly indicating the reasons for" that determination. (CEQA, § 21100, subd. (c); see also Guidelines, § 15128.) The EIR here satisfies that requirement with respect to its determination that the impact of the pipeline project on wildlife resources, including riparian habitat, will be less than significant. The assertion that riparian habitat will " 'continue to thrive along local streamcourses if canal leakage is eliminated' " constitutes a valid statement of reasons for the Agency's significance determination.

■ Notwithstanding an agency's compliance with the statement of reasons requirement, the agency's conclusion that a particular effect of a project will not be significant can be challenged as an abuse of discretion on the ground the conclusion was not supported by substantial evidence in the administrative record. Plaintiff offers no such challenge here, however, with respect to the Agency's determination that the pipeline project's effect on wildlife resources, including riparian habitat, will not be significant. Accordingly, we find no abuse of discretion in that portion of the EIR addressing the pipeline's effects on riparian habitat.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment, consistent with CEQA section 21168.9 and this opinion, granting plaintiff's petition for a writ of mandate. Plaintiff shall recover its costs on appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Morrison, J., concurred.

On April 9, 2004, the opinion was modified to read as printed above.