Filed 5/19/26 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CITIZENS AGAINST MARKETPLACE APARTMENT/CONDO DEVELOPMENT,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN RAMON,<br><br>      Defendant and Respondent;<br><br>MARKETPLACE AT SAN RAMON, LLC,<br><br>      Real Party in Interest. | A170988/A172221<br><br>(Contra Costa County Super. Ct. Nos. N22-1955, N23-0770)<br><br><br>**ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellant's petition for rehearing is DENIED. The court remains concerned about, and does not excuse or condone, appellant's counsel having attributed a quote to *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245 that does not exist in that opinion. However, we read appellant's petition for rehearing to concede that it was unnecessary to reach

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections B. and C.

1

the CEQA argument addressed in footnote three of the opinion. Accordingly, the opinion, filed on April 24, 2026, shall be MODIFIED as follows:

1. On page 14 (in the unpublished portion of the opinion), footnote three is deleted.

2. Footnote four is renumbered footnote three.

The modifications make no change to the judgment.

                                                    BURNS, J.

WE CONCUR:


JACKSON, P.J.
SIMONS, J.

*Citizens Against Marketplace Apartment / Condo Development v. City of San Ramon et al. (*A170988/A172221)

Superior Court of Contra Costa County, Nos. N22-1955 and N23-0770, The Hon. Danielle K. Douglas, Judge.

Greenfire Law, PC, Jessica L. Blome and Ariel S. Strauss, for Plaintiff and Appellant.

Burke, Williams & Sorensen, LLP, Nicholas J. Muscolino, Eric S. Phillips and Connor T. MacLean, for Defendant and Respondent.

Perkins Coie, Julie Jones, for Real Party in Interest.

Filed 4/24/26 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CITIZENS AGAINST MARKETPLACE APARTMENT/CONDO DEVELOPMENT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN RAMON,<br><br>    Defendant and Respondent;<br><br>MARKETPLACE AT SAN RAMON, LLC,<br><br>    Real Party in Interest. | A170988/A172221<br><br><br>(Contra Costa County Super. Ct. Nos. N22-1955, N23-0770) |

In these consolidated appeals, Citizens Against Marketplace Apartment/Condo Development (Citizens) appeals from denial of its petitions for writ of mandate and a post-judgment costs order. Citizens sought to overturn the City of San Ramon's approval of an infill housing project on the site of an aging shopping center. Citizens also challenges the city's conclusion that the project was exempt from the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) under the categorical exemption for "in-fill development"

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections B. and C.

1

(Cal. Code Regs., tit. 14, § 15332).[1]  In the published part of this opinion, we reject Citizens' arguments that the project conflicted with the city's general plan and zoning ordinance.  In the unpublished parts, we reject Citizens' CEQA argument and its challenge to the trial court's order awarding record costs to the city.  Accordingly, we affirm the judgment and post-judgment costs order.

## BACKGROUND

### A.

Real party in interest Marketplace at San Ramon (doing business as TRC Retail) owns Marketplace Center, which is a shopping center at the intersection of Alcosta Boulevard and Bollinger Canyon Road in San Ramon.  Since 2006, the city's general plan and zoning ordinance have designated and zoned the Marketplace Center for "[m]ixed [u]se."  The general plan and zoning ordinance define "[m]ixed [u]se" as single sites that combine residential and non-residential uses.

Constructed in the 1980s, Marketplace Center historically included a grocery store, a pharmacy, banks, restaurants, small retail stores, and the San Ramon Public Library.  In 2019, the grocery store, Nob Hill Foods, did not renew its lease.  TRC modified a different area of Marketplace Center to add a Trader Joe's grocery store.

In 2020, TRC proposed to redevelop a 6.99-acre portion of its total 12.47-acre parcel at the Marketplace Center.  It sought to demolish the buildings previously occupied by Nob Hill Foods and several small retailers and to convert that site to 284 housing units in a new five-story building.  Thirty-two of the proposed units would have been dedicated affordable housing.  TRC's

---

[1] Undesignated references to the "Guidelines" are to the state regulations that implement CEQA.  (Cal. Code Regs., tit. 14, § 15000 et seq.)

2

proposal triggered fierce public opposition. Some planning commissioners expressed concern that the proposal's height and large number of units made the design "out of scale" with the neighborhood. TRC withdrew the proposal.

In 2022, TRC returned with a more modest proposal to redevelop 3.91 acres of the site. This time, TRC sought to demolish the former grocery building and to build a smaller, lower-density mixed-use development—specifically 44 homes (40 single-family detached condominium units and four junior accessory dwelling units) plus renovation of an existing Starbucks coffee shop. TRC opted to pay an in-lieu housing fee instead of dedicating affordable units on the project site.

Counsel for Citizens submitted two letters to the planning commission opposing the project. The letters asserted that the project was inconsistent with the general plan's purported requirement to prepare a master plan and with mixed-use design requirements.

In October 2022, Citizens filed a petition for writ of mandate and declaratory relief (*Citizens Against Market Place Apartment/Condo Development v. City of San Ramon, et al.* (Super. Ct. Contra Costa County, 2022, No. N22-1955)), along with an ex parte application for a temporary restraining order. Citizens sought to compel the planning commission to notify TRC (in writing), before an upcoming deadline imposed by the Housing Accountability Act (Gov. Code, § 65589.5),[2] that the project is inconsistent with the general plan because TRC had not prepared a master plan with the owner of an adjacent property. (See *id.*, subd. (j)(2)(A)(i) [requiring city to notify developer within 30 days if project is inconsistent with certain land use criteria].)

---

[2] Undesignated statutory references are to the Government Code.

3

The trial court denied Citizens' request for a temporary restraining order. City staff notified TRC that the project was consistent with the relevant objective criteria. After several public hearings, the planning commission approved the project.

Citizens appealed the decision to the city council. In a report to the city council, staff analyzed the general plan policies at issue and concluded that the project was consistent with them. The city council voted unanimously to deny Citizens' appeal and approve the project. In the approved resolution, the City Council found that the project was consistent with the city's general plan and "is a horizontal mixed-use project as defined by applicable [c]ity standards." The city also found the project exempt from review under CEQA because it satisfied the eligibility criteria for the categorical exemption for in-fill development (Guidelines, § 15332).

**B.**

On April 19, 2023, Citizens filed a second petition for writ of mandate (Code Civ. Proc., § 1094.5) and declaratory relief (*Citizens Against Market Place Apartment/Condo Development v. City of San Ramon, et al.* (Super. Ct. Contra Costa County, 2023, No. N23-0770)), which sought to set aside the city's final project approval and adoption of a categorical exemption. The two cases were consolidated.

After briefing and a merits hearing, the trial court denied both of Citizens' petitions and entered judgment in favor of the city and TRC. On the merits, the trial court stated that substantial evidence supported the city's consistency findings. It also rejected Citizens' CEQA cause of action and awarded costs to the city.

## DISCUSSION

### A.

Citizens contends the city abused its discretion by approving the project despite conflicts with the city's general plan and zoning ordinance. Specifically, Citizens insists that the city ignored an allegedly mandatory requirement to prepare a "master plan" and that the project conflicts with the zoning ordinance's "mixed-use" definition. We disagree.

### 1.

To ensure an effective planning process, cities must adopt a general plan for development. (§ 65300.) The city's zoning laws and land use decisions must be consistent with the general plan. (§ 65860, subd. (a); *Save Lafayette v. City of Lafayette* (2022) 85 Cal.App.5th 842, 850.)

General plans are developed in a public process and reflect a range of competing interests. (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153-154 (*Orange Citizens*); *Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 17.) General plans typically state broad policies and goals rather than specific mandates or prohibitions. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 411-412.) State law does not require projects to completely satisfy every general plan policy—no project *could* do so. It falls to city officials to evaluate a proposed project against the range of competing interests reflected in the general plan. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.) A project is consistent with a general plan " ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Orange Citizens,* at p. 153.) Similar principles apply to local officials' interpretation of their own zoning ordinance. (*Anderson*

5

*First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193.)

We review the city's decision, not the trial court's. (*Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1125; *Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto, supra,* 1 Cal.App.5th at p. 19.) We must be mindful of intruding on city officials' " ' "unique competence to interpret [city] policies" ' " when making a "fundamentally adjudicatory" determination. (*Orange Citizens*, *supra*, 2 Cal.5th at p. 155.) Accordingly, we review the city's decision approving a housing project for abuse of discretion, deferring to the city's consistency finding "unless no reasonable person could have reached the same conclusion." (*Ibid.*; *Save Livermore Downtown,* at pp. 1125-1126.) Citizens bears the burden of demonstrating the city abused its discretion. (*Holden v. City of San Diego*, *supra*, 43 Cal.App.5th at p. 413.)

**2.**

First, Citizens argues that the project is inconsistent with the general plan because the general plan (allegedly) requires TRC to prepare a "master plan" to redevelop this site.

Citizens is referring to policy 4.6-I-26, which applies to the entire Marketplace Center site and an adjacent site (Orchard Supply Center), owned by a separate entity. The policy objective is stated in discretionary, not mandatory, language: "Encourage the joint redevelopment of the Marketplace and Orchard Supply Center sites via the applicant's preparation of a master plan (a 'Master Plan') where made feasible by common or separate ownerships." To further this objective, the policy continues: "Any such Master Plan should focus on facilitating improved circulation, access, and visibility, as well as encouraging a broader mix of uses, including residential. Additionally, in the event of any redevelopment or reconfiguration of either site that involves the net addition of 10,000 square feet or more of rentable

6

space and/or the introduction of any residential use, a Master Plan would be required that would contain an analysis of additional features intended to improve circulation, access, and visibility, encourage a broader mix of uses, and/or convert existing uses to residential."

The policy also indicates that the neighboring Orchard Supply Center site suffers poor visibility because of its distance from major roads and states: "As both sites are currently operated, however, there is currently little incentive for either property owner to redevelop in the short-term; however, in the future if key tenants decide to leave and there is an opportunity for substantial redevelopment or reconfiguration, the intent of this policy is to require preparation of a coordinated Master Plan for the area to facilitate improved circulation, access, and visibility and to broaden the mix of uses on one or both sites in a way that better supports successful retail at one or both sites. [¶] This policy also recognizes that as of the date of its adoption, the two sites are not under common ownership, which would make a Master Plan difficult. This policy would thus not apply in the case of tenant improvements or other minor modifications (including, but not limited to, façade modifications), or any relocation or replacement of existing rentable square footage for substantially the same retail purposes, which relocation or replacement does not add 10,000 square feet or more of rentable space or residential use to either site."

The city noted that the general plan does not define the term "Master Plan." It found the intent of the master plan policy was to " 'encourage the joint redevelopment' " of the two sites and to " 'focus on facilitating improved circulation, access, and visibility, as well as encouraging a broader mix of uses, including residential.' " The project was compatible with the policy because the project introduces residential uses to the Marketplace Center and includes "specific proposals that improve circulation, access,

and visibility, both within the Marketplace site and also between the Marketplace and Orchard Supply Center sites."

The city did not abuse its discretion. In arguing that the city misconstrued the policy, Citizens points to the instances where the general plan uses the term "require" or "required." But Citizens largely ignores the policy's equivocal and discretionary language. Indeed, the objective itself is merely to "encourage" joint redevelopment via a master plan "where . . . feasible." (See *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 696-696 [observing that "encourage" is the sort of amorphous policy term that gives local officials discretion].) Neither "master plan" nor "feasible" are defined. The policy acknowledges the reality that, for several reasons, joint redevelopment may be difficult or may not occur at all. If redevelopment occurs at one or both sites, the policy includes (very general) planning goals to improve circulation, access, and visibility and to "encourage a broader mix of uses," including residential. Altogether, the master plan policy is amorphous and aspirational. If the general plan's drafters had intended to state a mandatory requirement, they could easily have written one. (See, e.g., *Orange Citizens*, *supra*, 2 Cal.5th at p. 156 [city abused its discretion by permitting development on property the general plan designated as open space, which was defined unambiguously as " 'areas that should not be developed' "].) They did not.

We must take seriously our Supreme Court's admonition that planning agencies are uniquely competent when interpreting their general plans in this context and that courts must defer to them "unless no reasonable person could have reached the same conclusion." (*Orange Citizens*, *supra*, 2 Cal.5th at p. 155.) General plans sometimes do have concrete, unambiguous requirements. (See, e.g., *id*. at pp. 156-158.) But, in general, undefined terms and vague, aspirational language are par for the

8

course.  (See, e.g., *Olen Properties Corp. v. City of Newport Beach* (2023) 93 Cal.App.5th 270, 277-279 [deferring to city's determination that 3.41-acre project was consistent with undefined concept of 10-acre "residential village"]; *Joshua Tree Downtown Business Alliance v. County of San Bernardino, supra*, 1 Cal.App.5th at pp. 696-698 [deferring to local discretion to interpret amorphous "policy of encouraging and supporting small independent businesses"].)  General plans reflect conflicting interests and an arduous public drafting process.  Determining project consistency is, by design, nearly always an exercise of discretion: the city's job is to interpret the language, weigh and balance the various policies and interests reflected in it, and determine whether, overall, the project is compatible with, and does not frustrate, the general plan.  (See *Orange Citizens*, at pp. 153-154; *Bankers Hill 150 v. City of San Diego* (2022) 74 Cal.App.5th 755, 776; *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 677-678.)

In this case, the city was given a proposal that addresses all of the general plan's substantive objectives, albeit not packaged in a master plan.  The project would redevelop part of an aging strip mall into housing, which is an explicit goal of the general plan.  It includes features—such as demolition of vacant buildings and construction of new driveways, pedestrian crosswalks, and sidewalks—that address the general plan's objectives to improve circulation, access, and visibility within the Marketplace Center site as well as the neighboring commercial site.  The city thus concluded that, overall, the project is consistent with the general plan.  Citizens fails to persuade us that no reasonable person could agree.

9

**3.**

Citizens fares no better with its challenge to the city's conclusion that the project is properly deemed horizontal mixed use.

In the general plan, a mixed use classification applies to "[i]ntegrated mix of residential and non-residential uses—retail, service, office . . . . Types of mixed use development should consider both vertical and horizontal opportunities to provide a compatible mix of land uses consistent with the policies of the [g]eneral [p]lan. Vertical mixed use is characterized as multi-story buildings with uses such as residential or office uses over more active ground floor pedestrian-oriented commercial, service or retail uses. Horizontal mixed use includes the same diversity of uses, but may not be constructed in a vertical configuration. Under a *horizontal* mixed use configuration, a project *may* have a commercial street frontage with other residential or office uses set to the back of the project site *while still maintaining the overall mix of compatible uses*." (Italics added.)

The zoning ordinance also states that a "mixed use project shall comply with the following requirements[:] A mixed use project combines a mix of uses on the same site. In the CCMU and MU zones, the residential units of mixed use projects are *typically* located above the nonresidential uses (vertical mixed use), but *horizontal* mixed use *may be allowed* which provides residential at ground level *behind street-fronting* nonresidential uses." (Italics added.)

Citizens argues that the project cannot be "horizontal mixed use" because its residential component is not located "behind" its nonresidential component (Starbucks), which it also insists is not "street-fronting."

Here, the project site abuts three streets, one of which (Market Place) forms a wavy 90-degree angle. If one were to

10

stand on Alcosta Boulevard or on the eastern portion of Market Place, in front of the Starbucks, the residential portion of the project is behind the Starbucks and other non-residential uses (the remaining Marketplace Center retail establishments, which TRC has not included within the scope of the project). And the maps in the record show the non-residential portion of the project (Starbucks), as well as the other retail establishments at Marketplace Center, are all street-fronting. On the other hand, if one were to stand on the west end of Market Place, some of the residences face the street, with Starbucks situated behind them.

Consistency in this instance is, again, precisely the sort of policy interpretation that courts leave to city officials. On the substantial evidence we have just summarized, a reasonable person could find the project consistent with the general plan and zoning ordinance.

We need not reach the parties' additional arguments. With respect to the Housing Accountability Act (§ 65589.5), we note that the city approved the project after finding it consistent with the general plan policies discussed above. Because we have upheld the consistency findings, we need not also determine whether, hypothetically, the Housing Accountability Act would have barred the city from denying or conditioning the project. (See *Save Livermore Downtown v. City of Livermore*, *supra*, 87 Cal.App.5th at pp. 1125-1126.)

## B.

Citizens contends the city abused its discretion in concluding the project is exempt from CEQA review. (Guidelines, § 15332; *Protect Tustin Ranch v. City of Tustin* (2021) 70 Cal.App.5th 951, 960 [standard of review].) We disagree.

With limited exceptions, CEQA requires preparation of an EIR before a public agency approves or carries out a project that may have a significant effect on the environment. (*Sierra Club v.*

11

*County of Fresno* (2018) 6 Cal.5th 502, 511–512, 523; Pub. Resources Code, § 21151.)  Categorical exemptions define classes of projects that, by regulation, the Secretary of the Natural Resources Agency has determined do not have a significant effect on the environment.  (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092; Pub. Resources Code, § 21084; Guidelines, § 15300.)  By statute, CEQA does not apply to the projects within the exempt categories.  (Pub. Resources Code, § 21080, subd. (b)(9).)

The city determined the project is exempt from CEQA review under the categorical exemption for in-fill development, which applies to projects that meet, inter alia, the following criteria: "(a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations. [¶] . . . [¶]  (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality." (Guidelines, § 15332.)

First, Citizens argues that the project is inconsistent with "applicable general plan policies" or "applicable zoning designation and regulations."  (Guidelines, § 15332, subd. (a).) We reject this argument because, as our prior discussion shows, substantial evidence supports the city's findings that the project was consistent with the general plan and zoning policies at issue. (See *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 462 [inconsistency analysis is no different for CEQA purposes than it is for general planning and land use purposes].)

Second, Citizens argues that substantial evidence does not support the city's conclusion that the project would have no significant traffic impacts.  (Guidelines, § 15332, subd. (d); *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 269

(*Banker's Hill*) [traditional substantial evidence standard of review applies].)  The record contains two expert traffic analyses, which show significant decreases in trips and vehicle miles travelled.  Citizens concedes that one of the analyses calculates the reduction of driving caused by the proposed changes to land use—from retail to residential—and that this reduction includes fewer shopping trips to Nob Hill Foods.  But Citizens makes a narrow argument that the analysis should have analyzed what it calls diversionary trips, i.e., additional miles travelled by former Nob Hill Foods shoppers who would now travel significantly further to shop elsewhere.

We are not persuaded.  In addition to the Trader Joe's, there are five other grocery stores within two miles of the Nob Hill Foods site.  Citizens offers only speculation that shoppers would drive significantly further to buy groceries, and it makes no effort to quantify the purported increase and demonstrate it would be material.  (See *Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 36 [rejecting unsupported claim that traffic analysis was materially incomplete]; *Banker's Hill, supra*, 139 Cal.App.4th at p. 274 ["although local residents may testify to their *observations* regarding existing traffic conditions, 'in the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence' "], some italics omitted; see also *Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 894 [nonexpert opinions do not constitute substantial evidence where expertise is needed].)

The city's finding that the project will not result in significant traffic effects is supported by substantial evidence, including the expert traffic analyses.  (See *Banker's Hill,*

*Hillcrest, supra,* 139 Cal.App.4th at pp. 269, 273.) We need not address Citizens' additional CEQA arguments.[3]

## C.

Lastly, Citizens challenges the trial court's award to the city of $38,568.62 in record preparation costs. Citizens suggests that the city cannot recover those costs because Citizens itself elected to prepare the record pursuant to Public Resources Code section 21167.6, subdivision (b)(2). Citizens also argues the

[3] We summarily reject Citizens' argument that the city effectively approved the project, for CEQA purposes, early in the planning process when the planning commission notified TRC, in compliance with a process set by the Housing Accountability Act, that the application was not inconsistent with the city's objective standards. Citizens forfeits this startling assertion by failing to present a comprehensible and reasoned argument explaining how the authority it cites furthers its position. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

In one instance, in its opening brief, Citizens goes so far as to attribute a quotation to *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245 that does not exist in that opinion. We caution Citizens' counsel that similar conduct in the future could be cause for sanctions. (See Rules Prof. Conduct, rule 3.3(a)(2) [counsel shall not "knowingly misquote to a tribunal the language of a book, statute, decision or other authority"]; Cal. Rules of Court, rules 8.204(a)(1)(B) [each point must be supported by legal authority], 8.276(a)(4) [appellate courts may impose sanctions against appellate counsel for committing any unreasonable violation of Rules of Court]; *Noland v. Land of the Free, L.P.* (2025) 114 Cal.App.5th 426, 445 ["it is a fundamental duty of attorneys to *read* the legal authorities they cite in appellate briefs or any other court filings to determine that the authorities stand for the propositions for which they are cited"]; see also Bus. & Prof. Code, § 6068, subd. (d) [attorney's duty "never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law"].)

amount of the award is excessive in several respects.  We disagree on the former point and deem the latter point forfeited.

## 1.

Approximately three months after the second petition was filed, and after the city had spent significant labor hours preparing the underlying documents and estimated a cost of $45,000 to $55,000 for it to prepare the administrative record, Citizens notified the city that Citizens would prepare the administrative record itself.  The city provided Citizens with copies of the documents and Citizens compiled an administrative record totaling 16,287 pages.

Although it is not in the record before us, the parties agree that the city filed a memorandum of costs, in which it sought recovery of $51,967.62 in costs it incurred in preparing the administrative record.  Citizens filed a motion to tax costs, arguing, among other things, that the city's costs for preparation of the administrative record were inflated and unreasonable.  After a hearing, the trial court granted Citizens' motion in part and denied it in part; the court ordered Citizens to pay the city $38,568.62 for costs found to be "reasonable."

## 2.

In general, and except as otherwise provided by statute, a prevailing party is entitled to recover costs.  (Code Civ Proc., § 1032, subd. (b); see *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1151-1152.)  Code of Civil Procedure section 1094.5, referenced in Citizens' second writ petition, further provides that, except when otherwise prescribed by statute, the cost of preparing the record shall be borne by the petitioner.  (*Id.*, subd. (a).)  If an expense associated with preparation of the record has been borne by the prevailing party, the expense shall be recoverable as costs.  (*Ibid.*; *The Otay Ranch,*

15

*L.P. v. County of San Diego* (2014) 230 Cal.App.4th 60, 67-72 (*Otay Ranch*).)

Public Resources Code section 21167.6 governs the preparation and certification of the administrative record in a CEQA case. Under Public Resources Code section 21167.6 and Code of Civil Procedure sections 1032 and 1094.5, Citizens must pay any *reasonable* costs the city *actually* incurred associated with the preparation of the administrative record. (Pub. Resources Code, § 21167.6, subds. (b)(1)(A) ["[t]he parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court"], (f) ["the party preparing the record of proceedings shall strive to do so at reasonable cost in light of the scope of the record of proceedings"]; *Otay Ranch, supra,* 230 Cal.App.4th at p. 67; *Wagner Farms, Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 774 ["the prevailing party in a CEQA proceeding . . . may recover as costs the amounts it reasonably and necessarily incurred in preparing the [record of proceedings]"].)

Public Resources Code section 21167.6 authorizes a writ petitioner to prepare the administrative record itself instead of asking the public agency to prepare it. (Pub. Resources Code, § 21167.6, subd. (b)(2); *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 180, fn. 31.) But the fact that Citizens elected to prepare the record, pursuant to Public Resources Code section 21167.6, subdivision (b)(2), does not mean the city had no recoverable costs associated with preparation of the administrative record. To the extent Citizens is asserting that the city is precluded from receiving an award of record preparation costs as the prevailing party, it is simply wrong. (See *St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989, 1014, 1016-1017, 1019.)

16

Labor costs (of both public employees and retained attorneys) incurred to prepare an administrative record are recoverable under Public Resources Code section 21167.6, subject to trial court review for necessity and reasonableness. (Code Civ. Proc., § 1033.5, subd. (c); *Otay Ranch, supra,* 230 Cal.App.4th at pp. 67-70 [rejecting argument that compensation for time spent by retained attorney and paralegals was abuse of discretion and amounted to award of attorney fees when trial court found it was reasonably necessary to incur such costs]; *River Valley Preservation Project v. Metropolitan Transit Development Bd., supra,* 37 Cal.App.4th at pp. 180-182 [labor costs of public employees are recoverable; "interpretation . . . allowing reimbursement for only photocopying and transcription costs would defeat the purpose of the statute by shifting the financial burden to the public agency preparing the record"].) " 'Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court.' " (*Otay Ranch,* at p. 68.) The appellants bear the burden of demonstrating an abuse of discretion. (*Ibid.*)

Citizens cannot meet that burden here. Citizens has not included the city's memorandum of costs, which categorizes the various costs sought, in the appellate record. Instead, it cites the parties' briefs filed below.[4] Thus, Citizens cannot demonstrate an abuse of discretion in the amount of costs the trial court awarded because it fails to provide an adequate record for review. (*Hotels*

---

[4] About a week before oral argument (after we had issued our tentative opinion), the parties filed a "stipulation to submit memorandum of costs." We construed this filing as a motion to augment the record, which we denied as untimely. (See Cal. Rules of Court, rule 8.155(a)(1)(A); Ct. App., First Dist., Local Rules of Ct., rule 4(c) ["[a]ppellant should file any [request to augment a record] . . . no later than 30 days after the record has been filed in this court"]; *People v. Preslie* (1977) 70 Cal.App.3d 486, 492.)

*Nevada, LLC v. L.A. Pacific Center* (2012) 203 Cal.App.4th 336, 348 [" '[f]ailure to provide an adequate record on an issue requires that the issue be resolved against appellant' "].)

Absent an adequate record, we must presume that the trial court's necessity and reasonableness determinations were correct. (See *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 [if an appellant asserts an error on only a partial record, and the missing part of the record could provide grounds for affirming the judgment, the appellate court will affirm the judgment].)

## DISPOSITION

The judgment and post-judgment order denying in part Citizens' motion to tax costs are affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (a)(2).)


                                                        BURNS, J.

WE CONCUR:


JACKSON, P.J.
SIMONS, J.

*Citizens Against Marketplace Apartment / Condo Development v. City of San Ramon et al. (*A170988/A172221)

Superior Court of Contra Costa County, Nos. N22-1955 and N23-0770, The Hon. Danielle K. Douglas, Judge.

Greenfire Law, PC, Jessica L. Blome and Ariel S. Strauss, for Plaintiff and Appellant.

Burke, Williams & Sorensen, LLP, Nicholas J. Muscolino, Eric S. Phillips and Connor T. MacLean, for Defendant and Respondent.

Perkins Coie, Julie Jones, for Real Party in Interest.